**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| ─────────────────── x | | |
| JOHN A. THORNBURG, Individually and on Behalf of All Others Similarly Situated, | : : : | |
| Plaintiff, | : : | Civil Action No. 4:24-cv-00823 |
| vs. | : : | |
| AMERICAN AIRLINES GROUP INC., ROBERT D. ISOM JR., DEVON E. MAY, DAVID G. SEYMOUR, GANESH JAYARAM, COLE BROWN and VASU S. RAJA, | : : : : : : | |
| Defendants. | : : | **DEMAND FOR JURY TRIAL** |
| ─────────────────── x | | |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff John A. Thornburg ("Plaintiff"), by his attorneys, alleges the following based on the investigation of counsel which included a review of United States Securities and Exchange Commission ("SEC") filings by American Airlines Group Inc. ("American Airlines" or the "Company"), press releases issued by American Airlines, public statements issued by defendants, securities analysts' reports about the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.     This is a securities class action on behalf of all purchasers of American Airlines common stock during the period between July 20, 2023 and May 28, 2024 (the "Class Period"), alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, promulgated by the SEC, 17 C.F.R. §240.10b-5.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the claims asserted in this Complaint pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331.

3.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act. American Airlines is headquartered in the Fort Worth Division of the Northern District of Texas and certain acts and conduct complained of herein, including the dissemination of many of the materially false and misleading information to the investing public, occurred in this District.

4.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate wire and telephone communications.

**THE PARTIES**

5.      Plaintiff John A. Thornburg acquired American Airlines common stock during the Class Period, as set forth in the certification attached hereto and incorporated by reference, and was damaged thereby.

6.      Defendant American Airlines is a holding company whose principal, wholly-owned subsidiaries are: American Airlines, Inc., Envoy Aviation Group Inc., PSA Airlines, Inc. and Piedmont Airlines, Inc.  The Company operates as a network air carrier, which provides scheduled air transportation services for passengers and cargo through its hubs in Charlotte, Chicago, Dallas/Fort Worth, Los Angeles, Miami, New York, Philadelphia, Phoenix, and Washington, D.C., as well as through partner gateways in London, Doha, Madrid, Seattle/Tacoma, Sydney, and Tokyo.

7.      Defendant Robert D. Isom Jr. ("Isom") was, at all relevant times, the Company's President, Chief Executive Officer ("CEO") and a member of its Board of Directors (the "Board").

8.      Defendant Devon E. May ("May") was, at all relevant times, the Company's Executive Vice President ("VP") and its Chief Financial Officer ("CFO").

9.      Defendant David G. Seymour ("Seymour") was, at all relevant times, the Company's Executive VP & Chief Operating Officer.

10.      Defendant Ganesh Jayaram ("Jayaram") was, at all relevant times, the Company's Executive VP and Chief Digital & Information Officer.

11.      Defendant Cole Brown ("Brown") was, at all relevant times, the Company's Senior VP & Chief People Officer.

12.      Defendant Vasu S. Raja ("Raja") was, between April 2022 and May 28, 2022, the Company's Senior Vice President, Chief Commercial Officer.  Previously he held the role of Chief Revenue Officer and Senior Vice President of Network Strategy, where he was responsible for Network and Alliances.

13.     Defendants Isom, May, Semour, Jayaram, Brown and Raja are sometimes referred to herein collectively as the "Individual Defendants." The Individual Defendants made, or caused to be made, false statements that artificially inflated the prices of American Airlines common stock during the Class Period. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of American Airlines' press releases, interim financial reports, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

14.     Defendants American Airlines and the Individual Defendants are sometimes referred to herein collectively as the "Defendants."

15.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose non-public facts known to them about American Airlines and the true market value of its common stock. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of American Airlines common stock was a success, as it: (i) deceived the investing public regarding American Airlines' prospects and business; (ii) artificially inflated the market price of American Airlines common stock; and (iii) caused Plaintiff and other members of the Class to purchase American Airlines common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all persons who acquired American Airlines common stock during the Class Period (the "Class").  Excluded from the Class are Defendants, members of their immediate families, and officers and directors of American Airlines and their immediate families.

17.     The members of the Class are so numerous and geographically dispersed across the country that joinder of all members is impracticable.  More than 656 million shares of American Airlines common stock (ticker symbol "AAL") were traded in an efficient market on the NASDAQ during the Class Period.

18.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and each member of the Class purchased the Company's common stock during the Class Period and sustained injury as a result.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

20.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable, and the damages suffered by individual members of the Class may be relatively small, making the expense and burden of individual litigation an impossible hurdle for members of the Class to seek redress individually for the wrongs done to them.  There will be no difficulty in the management of the Class as a class action.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)      Whether Defendants' acts and omissions as alleged in the Complaint violated the Exchange Act, and

(b)      Whether the members of the Class have sustained damages, and if so, what is the proper measure of damages.

## SUBSTANTIVE ALLEGATIONS

### Background

22.      During fiscal year 2019 ("FY19"), the last year before the global Covid-19 pandemic struck – greatly diminishing global travel trends – together with its wholly-owned regional airline subsidiaries and third-party regional carriers, American Airlines operated an average of 6,800 flights per day to more than 365 destinations in 61 countries through its hubs and gateways in Charlotte, Chicago, Dallas/Fort Worth, London Heathrow, Los Angeles, Miami, New York, Philadelphia, Phoenix and Washington, D.C.  As of December 31, 2019, the Company operated 942 mainline aircraft supported by its regional airline subsidiaries and third-party regional carriers, which operated an additional 605 regional aircraft.  Approximately 215 million passengers boarded an American Airlines flight that year.

23.      Meanwhile, in October 2019, Defendant Raja had been appointed as American Airlines' Senior VP of Strategy, where he made bold changes, ultimately earning him a promotion to its Chief Commercial Officer in April 2022.  For example, Raja advocated for an American Airlines hub in Boston; for a Northeast operating agreement with JetBlue; for a Seattle hub partnership with Alaska Airlines; and even for a Seattle-Bangalore flight.  But within weeks, each of these plans would be upended by the global Covid-19 pandemic.  To address the pandemic, Defendant Raja devised a number of seemingly innovative strategies.  For example, while its competitors pulled back, American Airlines would ramp up its Sunbelt flying, pushing beach-seeking customers through its Charlotte and Dallas hubs.

24.     Unfortunately, another set of Defendant Raja's strategies would entail pushing American Airlines' corporate customers, i.e. its business class customers, to book through its own website rather than through the corporate travel agencies business class customers had historically employed.  Trying to pay down the debt load the Company had amassed during the pandemic, with a new sales strategy plan first announced in December 2022, American Airlines bet that a slowdown in business travel following the pandemic would help it push dramatic changes in its relationships with these corporate customers by eliminating the discounts paid to corporate travel agents.  To do so, the Company would slash its sales staff and remove some fares from the channels that corporate customers historically used, aiming to coax more corporate travelers to book directly on American Airlines' own website or web app.  The Company would also make the deep cuts to its sales team as part of its bet that the corporate contracts and deals that had long dictated business travel had somehow become less important, and that the Company could leverage its vast network and loyalty program to win more direct-book business.  In so doing, American Airlines would essentially dismantle its corporate sales division in favor of a new distribution capability, or "NDC," strategy through which frequent flyer mileage points would be restricted unless passengers utilized the American Airlines website or all but a few select travel agencies.  In so doing, American Airlines would effectively pull some 40% of its lowest fares from many online booking platforms employed by travel agencies and their customers.

25.     Unbeknownst to investors, by alienating travel agencies and corporate customers who were among the airline's highest spending customers, these new strategies were driving away lucrative corporate customers and dragging down the Company's revenues and earnings.  Internally, Defendants immediately knew the intended rollout of the new NDC sales strategies in April 2023 were – at best – highly questionable.  Indeed, American Airlines' move to favor NDC bookings faced an immediate and strong backlash from the travel agent community.  The American Society of

Travel Advisors ("ASTA") soon called it a "clear abuse" of market power in a March 2023 letter to the Consumer Protection and Antitrust Divisions of the United States Department of Justice, as the Company promised to withdraw 40% of its fares from operators using the widely adopted Global Distribution System ("GDS"). "To put this in perspective, the IATA advised that during 2022, just 10% of indirect airline sales came from NDC-based connections." And that was up 5-6% in one year (from 2021). Ultimately this threatened to prevent huge swathes of the travel agent community from accessing the most competitive fares from American Airlines, including many corporate travel management companies (or "TMCs").

### Materially False and Misleading Class Period Statements

26.     The Class Period starts on July 20, 2023. On that day, before the opening of trading, American Airlines issued a press release announcing its second quarter 2023 ("2Q23") financial results for the interim period ended June 30, 2023. In addition to reporting that the Company had achieved "Record quarterly revenue of $14.1 billion, a 4.7% increase year over year," "Second-quarter net income of $1.3 billion, or $1.88 per diluted share," "Generated operating cash flow of $1.8 billion and free cash flow of $1.2 billion in the second quarter," the Company announced that it was "Raising full-year adjusted EPS2 guidance to between $3.00 and $3.75 per diluted share." The release attributed the strong results to Defendants' business acumen and emphasized the Company's return to profitability post pandemic without disclosing the true reasons why, quoting Defendant Isom stating in pertinent part that "It was another fantastic quarter for American, driven by the hard work of our team to deliver a reliable operation for our customers and the ***continued strong demand for our product.***"[1] The release further quoted him emphasizing that "Our operation is performing at historically strong levels, and we have worked to refresh our fleet and build a comprehensive global network, all of which helped to produce record revenues in the second quarter," adding that "We will

---

[1]     All emphasis is added unless otherwise noted.

build on this momentum the rest of the year and continue to prioritize reliability, ***profitability***, accountability and strengthening our balance sheet." Heralding the Company's return to profitability post pandemic, the release went on to state in pertinent part as follows:

> The strong revenue performance ***was driven by continued broad-based demand strength*** and American's completion factor performance in the quarter. ***Demand was particularly strong in the month of June*** driven by an increase in close-in bookings. Domestic and short-haul international revenue continue to perform well, and the airline has seen noticeable strength in long-haul international demand and yield performance.

27.     During the conference call held with investors and stock analysts later that morning, Defendant Isom opened his remarks once again doubling down on the new strategic changes and heralding the Company's return to profitability which he once again attributed to the Defendant's strong business acumen rather than profiting off of the strategic measures undertaken to cut out the discount credits previously paid to travel agents and other measures adopted as part of the strategic changes adopted to boost post pandemic profitability, stating in pertinent part as follows:

> The summer is well underway, and the American Airlines team is ***firing on all cylinders***. ***We continue to build on the strong foundation we have laid over the past year*** and remain focused on reliability, profitability, accountability and strengthening our balance sheet.
>
> That focus is showing up in our results. ***Everything we have said we would do at the start of the year, we have done***. Our operation is performing at historically strong levels. And this morning, we reported adjusted pretax earnings of approximately $1.8 billion for the second quarter. These earnings were well above the high end of our latest EPS guidance range, marking our fifth consecutive quarterly profit. At the start of the recovery, we told you that returning to profitability hinged on running a reliable airline. ***American continues to run a strong operation in an evolving environment in which we are very well positioned because of the hard work our team has done in recent years***.
>
> Our sustained profitability is tied to ***our leading network rewards program and operation***. We have a tremendous network and we operate in a reliable and efficient way, and we reward our customers for using it.

28.     On September 13, 2023, despite increased fuel prices, American Airlines announced that "As a result of its ***continued strong operating performance***, the Company now expects its third-quarter capacity to be at the high end of its initial guidance, or up approximately 6% to 7%

versus the same period in 2022.  Total revenue for the third quarter is expected to be approximately flat to prior expectations," and that "[B]ased on these updated assumptions, the Company expects its third-quarter adjusted operating margin to be approximately 4.0% to 5.0% and adjusted earnings per diluted share to be between approximately $0.20 and $0.30."

29.     On September 20, 2023, in order "to appropriately incentivize his leadership in overseeing the positive business momentum following the Company's successful post-pandemic transformation," which it claimed had "***driven profitability***, strong operational reliability and a strengthened financial position," the American Airlines Board's Compensation Committee announced it had approved a "total target direct annual compensation" plan for Defendant Isom including "a base salary of $1,300,000, target cash incentive opportunity of 200% of base salary and an annual target long-term incentive grant value of $11,250,000 under the Company's 2023 long-term incentive program."

30.     On October 19, 2023, before the opening of trading, American Airlines issued a press release announcing its third quarter 2023 ("3Q23") financial results for the interim period ended September 30, 2023.  In addition to reporting that the Company had achieved "Record third-quarter revenue of approximately $13.5 billion," the release quoted Defendant Isom attributing the strong results to business acumen rather than changes to the strategic plan, stating in pertinent part that "The American Airlines team continues to produce strong results," and that its "team [was] delivering record-setting reliability and operational performance" and "executing on [its] plans and remain well-positioned for the future, supported by the strength of [its] network, [its] young and modern fleet, and [its] outstanding team."  As to its "Guidance and investor update," the release stated that "Based on demand trends and the current fuel price forecast and excluding the impact of special items, the company expects its fourth-quarter 2023 adjusted operating margin to be 2% to

4%," adding that "American now expects its full-year 2023 adjusted operating margin to be approximately 7%."

31.     During the conference call held with investors and stock analysts later that morning, Defendant Isom opened his remarks once again doubling down on the new strategic changes and heralding the Company's return to profitability which he once again attributed to the Defendant's strong business acumen rather than profiting off of the strategic measures undertaken to cut out the discount credits previously paid to travel agents and other measures adopted as part of the strategic changes adopted to boost post pandemic profitability, stating in pertinent part as follows:

> Today, American reported an adjusted pretax profit of approximately $362 million for the third quarter and earnings result that was above the high end of our latest EPS guidance range. **The American Airlines team continues to produce strong results**. And as we look ahead to the rest of the year, we continue to prioritize reliability, profitability, accountability and strengthening the balance sheet.
>
> *                    *                    *
>
> We produced record third quarter revenues of approximately $13.5 billion, ***driven by a resilient demand environment and record travel rewards program revenue***. Domestic demand remains steady, while international demand continues to drive revenue growth, led by the Atlantic, Caribbean and Central America.
>
> During the third quarter, ***we saw year-over-year growth in corporate and government revenue with a return to more traditional seasonality trends. We remain encouraged by what we're seeing with demand and revenue from unmanaged business travel.*** Importantly, more customers than ever are choosing our travel rewards program by acquiring our co-brand credit cards in record numbers and rolling in the AAdvantage program and shopping for our product through our direct channels.

32.     On January 24, 2024, announcing its 4Q and full year results for 2023 ("4Q23" and "FY23"), American Airlines noted that some 80% of its bookings were now coming from internet customers, with 65% of those via its own in-house channels.  It once again doubled down on its strategy, reiterating its goal of getting 100% of bookings this way.

33.     On March 4, 2024, American Airlines conducted its investor day conference during which Defendants once again doubled down on claiming that the new strategic changes coupled with

their business acumen were responsible for the Company's profitability, rather than profiteering off

of the strategic measures undertaken to cut out the discount credits previously paid to travel agents

and other measures adopted as part of the strategic changes adopted to boost post pandemic

profitability, with Defendant Isom starting out stating in pertinent part as follows:

> So I'm going to take you through a few things.  ***First, in terms of demand being back, it's returned.***  If there's one thing about the pandemic that we've learned, it's that people want to travel.  ***They've come back and we finally are at a point where you can see on the horizon very favorable trend*** and it's a backdrop that's good for American Airlines.
>
> Next, American is a changed airline.  We're very different than we were prior to the pandemic.  We're delivering on our commitments, and we're focused on our shareholders.  And I can't wait to talk to you more about all of that. And then finally, as we take a look at an investment thesis and ***looking forward, we think that we have competitive advantages that will propel American to sustainable margin expansion and ultimately delivering free cash flow***. So all of this is in store for today.
>
> \*       \*       \*
>
> So we've got a great fleet.  We're operating it really well.  We've got a network that is enviable. And on top of that, we now are looking at our AAdvantage program and really trying to make sure that we maximize it as a true rewards ecosystem. Now we're able to do that because we're in the process of renegotiating our co-brand credit card deals right now. But in doing this, this will also unleash tremendous value, not just with the co-brand credit cards, but also by underscoring that life as an AAdvantage member as best as you can get it in the airline business. Everything about being an AAdvantage member makes travel easier.
>
> ***And in that, I know that we will be able to attract customers, retain them and also offer them value for which they're willing to compensate us***.

34.     Next, Defendant Raja went on to explain the specifics of how the sales strategies he

engineered were purportedly well-received by customers and were in turn increasing the airline's

profitability, stating in pertinent part as follows:

> We are making it easier for customers also to shop in a way that's contemporary and tuned to the realities that they're in. And it's worth probably understanding just how far things have changed.
>
> Now historically, travel distribution, especially air travel distribution, has been nothing, if not complicated. Oftentimes for some very good reasons, airlines were doing contracted travel with corporations in a time before the Internet existed.  And so in order to solve that problem, airlines created technologies that exist outside of

the Internet for a period that is 30, 40, 50 years old. We created chains of intermediaries designed to help facilitate customer transactions. And even despite all of that, even today, we are left with a number of manual processes and workarounds.

And ultimately, the people who bear that expense are the customer and they see it in a few different ways. The air travel shopping experience is by no means contemporary in a world where so many of our customers can buy home or a car or a sandwich from their phone. Further, the servicing experience is oftentimes cumbersome, the thing which people should be able to change on the web or via their app oftentimes involve several calls to several different people.

And ultimately, that turns into expense, both in time and money. It's not too far to think that a small business in a high-growth city like El Paso is spending $25 or $35 per ticket to have all of this, which is very detuned with the other realities in their lives to this problem, and our AAdvantage business and which we are trying to solve the customers' modern contemporary problem. If a company contracts with us through AAdvantage business, what they enable is their travelers will be able to go and earn miles as a multiplier to what I just shared.

So their customers are going to earn even more miles than what I just shared on that prior slide. But very importantly, we can make all of our content available through any Internet-based booking tool there is right now, whether they prefer dot-com or a homegrown tool or another thing altogether, so they can get a contemporary retailing shopping experience, 100% of what we sell through AAdvantage business can be serviced online.

So none of their customers has to call anyone, they can do it from their app from the website. What this means is that the customer instead of spending $25 or $35 per ticket spends 0. It's a material savings for them, and it drives a material savings for us. But as customers and companies come direct to us, it's not just that it reduces expenses, ***it's driving satisfaction***. ***After several quarters of doing this now what we see is a statistically significant increase in NPS***.

***Customers who come to us directly or through modern Internet-based retail outlets, report net promoter scores that are 9 to 10 points higher than those who do not. It is our statistically highest Net Promoter Score category. And unsurprisingly, when your customers are happier with you, they're more likely to buy more valuable things.***

***What we also find is that customers who come through our direct channels or modern retailing sites have a 13 points higher propensity to buy a higher value fare when a lower one is available***. That's meaningful. And we're going to make it easier and easier for customers like this to use our product and be our customers.

35.     Finally, Defendant May went on to explain how these new strategies were

purportedly translating into increased profitability at American Airlines, stating in pertinent part as

follows:

- 12 -

We have developed a track record of delivering on all of our stated objectives, we have become an industry leader in operational performance while meeting the evolving needs of our customers. And we are focused on creating value in the near term and over the long term.

Now you've heard from the team about the value drivers and the value-created initiatives that we are executing on and how we are holding ourselves accountable to achieve them. ***We are well positioned to expand margins and consistently produce strong free cash flow.*** I'm going to talk about the value of our fleet and today's aircraft order. ***I'm also going to provide details on how we are reengineering the business to drive savings and greater productivity along with a better experience for our customers and team members. And lastly, I'll review the financial metrics that we expect to deliver on in the coming years.***

36.     On March 12, 2024, Defendants Isom and May presented at the J.P. Morgan Industrials Conference again in New York City, with Defendant Isom opening his remarks by claiming that the new sales strategies along with Defendants' business acumen was solely responsible for its increased reported profitability, stating in pertinent part as follows:

Now let me take you through American Airlines story, at least over the last couple of years. So as we came through the pandemic, one of the things that we identified was a real opportunity for American to not just return to where we were in 2019, but actually to accelerate our progress and to really be best in the business on any number of fronts. But we knew that because of the damage caused during the pandemic, and we borrowed a lot of money. We had a lot of issues in terms of rebound. We knew that we had to prove ourselves to the marketplace.

And we started with a very focused plan. A plan back as soon as I took over as CEO 2 years ago, that was based on returning the airline to reliability, reestablishing profitability because we had actually lost a considerable amount of money during the pandemic and then strengthening our balance sheet to address some of the borrowings that we had to take on during the pandemic as well. And that was the singular focus. Of course, we have really long-term goals, but that was a singular focus. And so how did we do on it? Well, American Airlines has never been the best at operating reliability, but we are today.

American Airlines canceled fewer flights on a percentage basis than any other airline, including the industry leader that had been kind of entrenched for more than a decade. I feel really great about where we are. And it's a big deal to American because as we go forward and look at capacity production, this is really efficient way to deliver capacity ***and actually hang on to revenue***. And we're seeing right now a 1.5 point improvement in terms of delivering completion factor year-over-year.

And on top of that, we know that the best way to serve our customers, the way to move Net Promoter Scores is by delivering on the most basic, which is reliability, getting people from start to finish with their bags on time every time. So we feel

great about this. This is not something we were known for prior to the pandemic. We were going through a massive integration between U.S. Airways and American at that time. As we went through the pandemic, we all suffered with start-up issues as we built back. But for the last 18 months, certainly in the last year, American Airlines has been the best in the business at producing capacity our customers. So great work on that front.

In terms of profitability, same story. As I take a look at 2023, and producing now 7 consecutive quarters of profitability, 2 straight years of profitability. The one thing I would ask you to note, though, that our profitability now is different than it was prior to the pandemic. And that is different in that we're producing record free cash flow, okay? So it's great news for us, but ***ultimately, that bodes well for the future for American Airlines***.

And as a result of all that, we've been able to really pull down the debt that we had taken on during the pandemic, we set a goal end of 2021 to reduce total debt by $15 billion. We're 75% of the way to that goal. ***By the end of this year, we'll be 85%*** and on top of that, look, we know that we're being noticed. So we've been upgraded by all 3 major credit rating agencies in 2023, a double notch upgrade. That's great news for American. And as we go forward, really something to build on. So reliability, excellent work, profitability plus producing free cash flow and a strengthened balance sheet. So I'm here today telling you that we, American Airlines, is a changed airline in the sense that ***we put goals out there, we hit them***.

37.   The statements referenced above in ¶¶ 26 through 36 were materially false and misleading when made because they failed to disclose the following adverse facts which were known to defendants or recklessly disregarded by them as follows:

(a)   that the new NDC sales strategies American Airlines adopted were not sustainable because they alienated travel agencies and the corporate customers who were among the airline's highest spending customers, drove away lucrative corporate customers and ultimately diminished the Company's revenues; and

(b)   as a result, American Airlines' business metrics and financial prospects were not a strong as indicated in its Class Period statements.

38.   After the close of trading on May 28, 2024 and during a conference held before the opening of trading on May 29, 2024, American Airlines announced that it was parting ways with Defendant Raja, the executive behind the Company's efforts to revamp the Company's sales

approaches in order to increase profitability to address the massive debt it had taken on during the Covid-19 pandemic.  He had been a champion of NDC from the start and had really pushed American Airlines' strategy in this respect, and could also take at least partial credit for the Sunbelt strategy, which Defendant Isom now admitted was not nearly as productive as Defendants had hoped.  The departure announcement made clear Defendant Raja's strategies were being blamed for the kerfuffle, with Defendant Isom stating in pertinent part as follows:

> I've known Vasu for a long time. [His] admirers, creative thinking, his passion. He's been an innovator, a disrupter.  He is a good friend, but ***sometimes we need to reset. And in this case, we do***.
>
> \*      \*      \*
>
> ***We have to be better*** at executing those long-range plans.  ***We have to be more attentive*** to the marketplace.  ***We have to be more detail-oriented*** and we have to go forward as a team and really ***make it easy*** for American to do business with.

39.     American Airlines also reported its first quarter 2024 ("1Q24") financial results that day, disclosing that it had swung to a huge ***loss***, despite having achieved record-breaking revenues. While much of that loss was attributed to operational issues, including those with Boeing, significant questions were also raised about the lack of growth in American Airlines' managed corporate travel market while direct competitors Delta and United had both reported a 14% ***increase*** in managed corporate booking in the first quarter.  Even Alaska Airlines' were up 22%, while Southwest Airlines had 25% more corporate bookings year-on-year.  To be sure, even getting that number for American Airlines was difficult, with CFO May only conceding that it was "mid-to-high single digits," although he still did not put a specific number on it.

40.     American Airlines also announced that it was slashing its second quarter 2024 ("2Q24") financial guidance, stating that the Company then only expected adjusted earnings of $1.00 to $1.15 per share, down from its previous range of $1.15 to $1.45 per share, and that its 2Q24 operating margin would come in approximately 1 percentage point lower than it had previously

promised, as revenue per available seat mile was then tracking well below the Company's previous outlook.

41.     Elaborating on the Company's weaker performance in 1Q24 and subsequent 2Q24 guidance adjustment later that afternoon at a Bernstein Strategic Decisions Conference, CEO Isom candidly admitted: "***We believe [this] is in part due to the changes that we have made to our sales and distribution strategy***."  Adding later during the call: "We all know that NDC, modern retailing, internet-based channels for selling our product is the future of airline distribution.  ***But we move faster than we should and we didn't execute well***," and that "***We regret that and the difficulties that it created for our agency and corporate communities***."  The impact of adoption of the NDC strategy had been felt clearly, as Isom admitted stating that: "One of the things that is very clear is that ***we've driven some customers away.  We restricted some customers from actually [finding] our product***.  Those are [the] kind of things that we have to be attentive to."

42.     Noting that Defendants had known for quite some time of the NDC strategy failures, Defendant Isom divulged that change was then well underway and that it would be to the benefit of TMCs and travel agents, adding:

> We're evaluating our strategy holistically and piece by piece. We spent a lot of time listening to our agencies and our corporate customers, and we're hearing [] their feedback.
>
> *          *          *
>
> We're taking some immediate actions to respond and adapt, and over the coming weeks, we'll be working to ensure that we're optimizing for our customers and American as we move forward.
>
> *          *          *
>
> We are going to modify our distribution strategy. Specifically, we need to work closely with our agencies and partners to ensure that the transition that we're making is not disruptive to our end customers

43.     Rather than pulling content from customers, Defendant Isom explained that the Company would work to promote NDC to those using legacy technologies, admitting: "***We've used***

*a lot of [sticks]*.  We've got to put more [carrots] in place and make sure that our product is available wherever customers want to buy it."  He further noted that going forward, American Airlines would be reviewing its many changes to its relationships with agencies and corporate customers, including how it solves problems and pays its agencies.  On the customer side, Defendant Isom committed to rolling back the changes to AAdvantage that would see no points earned for booking with non-NDC agents, adding: "We want to make sure that no customer that's out there traveling is made worse off from the changes that we make."

44.     On this news, the market price of American Airlines common stock plunged, falling nearly $2 per share, or more than 13%, on unusually high volume of approximately 159 million shares trading, or more than six times the average daily volume over the preceding ten days.  In the end, more than $1 billion in market capitalization simply vanished.

45.     On July 25, 2024, in connection with announcing its dismal 2Q24 financial results, American Airlines again slashed its profit forecast to between $0.70 and $1.30 a share – a significant drop from the $2.25 to $3.25 it had forecasted in April 2024 and well below the $1.10 to $2.60 per share it had led the investment community to then be expecting.  The Company further estimated a revenue drop of up to 4.5% in the third quarter 2024 ("3Q24") ending September 30, 2024.  The $717 million in net income reported in the 2Q24 marked a 46% drop from the prior year report.  In explaining the results to investors during the conference call held later that morning, Defendant Isom once again placed the blame squarely on American Airlines' "prior sales and distribution strategy."

46.     As emphasized in a July 25, 2024 report published by *Fortune* entitled "American Airlines' attempt to strong-arm its customers into buying tickets directly backfired, sending its profits down nearly 50%":

> American Airlines is sorry, okay?  After instituting a booking policy that rubbed many passengers the wrong way, the carrier has seen a dive in profits—and is now walking back the controversial strategy for fear of further hemorrhaging dollars.

The world's second-largest airline is basically standing outside annoyed travel agents' windows with a boom box asking for another chance after bungling it up. It can't afford not to, as its net income in the just-ended second quarter has slipped by 46% to $717 million from a year ago.  While the airline has seen record revenue this past quarter, the CEO acknowledges that they're off target for a couple of reasons.

"I want to first acknowledge that our current revenue performance is not where we want it to be," Robert D. Isom, American Airlines CEO, president, and director, said on a less-than-cheery earnings call on Thursday.  Attributing some of its issues to an industrywide "imbalance in domestic supply and demand" and American's former sales strategy, the CEO said, "we know we can do better, and we will rise to meet this challenge."

\*       \*       \*

The strategy Isom referred to is one where the airline made customers buy tickets directly, as opposed to having the freedom to book from other agencies.  The choice alienated corporate customers and led to the ousting of Vasu Raja, American's chief commercial officer, this past spring.  Stopping customers from using booking agencies in favor of American's own website proved to be too hasty a move, as *Bloomberg* noted complaints that the internal technology wasn't developed enough to handle this new policy.

Naturally, travel agents were incensed by the former rule. "To assume that all customers prefer to buy direct through AA.com is arrogant at best," wrote the American Society of Travel Advisors in a fiery statement.  "And claiming that consumers asked for NDC is like Apple claiming consumers asked that no wall charger be included with new iPhones.  We may have to live with it, but we certainly didn't ask for it," they said, referencing the new policy known as new distribution capability bookings.

Isom soon acknowledged that the plan had backfired. "We know we dug ourselves a hole in the second quarter," he said in late May at the Bernstein Strategic Decisions Conference.  Indicating his change of course, the CEO called for a "reset," adding that American "moved faster than we should have, and we didn't execute well."

But such choices end up leaving long-lasting dents in relationships.  "They're not going to be able to turn it around in three months—that's for sure," Helane Becker, a TD Cowen analyst, told *Bloomberg Television* this past spring.  "It will take at least 18 months to two years to turn things around, and even then it might take longer."

And now American is seeing the fruits of said misstep. In its latest earnings report, Isom said a "reset will take some time," likely impacting earnings throughout the rest of the year.

There's some mending of bridges to be done, too.  Isom said he's so far spoken to more than 30 of his counterparts at corporate customers: "We recognize we have a lot of relationships to repair."

- 18 -

**Additional Scienter Allegations**

47.     As alleged herein, American Airlines and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding American Airlines, their control over, and/or receipt and/or modification of American Airlines' allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning American Airlines, participated in the fraudulent scheme alleged herein.

**Applicability of the Presumption of Reliance
and Fraud-on-the-Market**

48.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     American Airlines stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of American Airlines stock; and

(e)     Plaintiff and other members of the Class purchased American Airlines common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

49.     At all relevant times, the market for American Airlines common stock was efficient for the following reasons, among others:

(a)     American Airlines common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b)     as a regulated issuer, American Airlines filed periodic public reports with the SEC; and

(c)     American Airlines regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of investor releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

50.     Plaintiff and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants include omissions of material fact for which there was a duty to disclose.

**Loss Causation/Economic Loss**

51.     During the Class Period, as detailed herein, the Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of American Airlines common stock and operated as a fraud or deceit on Class Period purchasers of American Airlines common stock by misrepresenting the Company's business and prospects.  Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of American Airlines common stock fell significantly, as the prior artificial inflation came out of the price over time.  As a result of their purchases of American Airlines common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

52.     Plaintiff repeats and re-alleges each and every allegation contained above in this Complaint.

53.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other members of the Class, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase American Airlines common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

54.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for American Airlines' common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons, as alleged below.

55.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about American Airlines' business operations and financial prospects, as alleged herein.

56.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of American Airlines' value and performance, which

included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company's business metrics and financial prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of American Airlines common stock during the Class Period.

57.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of American Airlines common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

58.     Plaintiff repeats and re-alleges each and every allegation contained in or re-alleged in Count I, above, as if fully set forth herein.

59.     The Individual Defendants each acted as a controlling person of American Airlines within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the true state of the Company's business metrics and financial prospects, the Individual Defendants each had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the press releases concerning the Company's business metrics and financial prospects.

60.     As set forth above, American Airlines and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of

their positions as controlling persons, the Individual Defendants are each liable pursuant to Section 20(a) of the Exchange Act.

61.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their acquisitions of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment:

A.     Determining that the action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and that Plaintiff be appointed Lead Plaintiff under the Private Securities Litigation Act of 1995 and as the representative of the Class and his counsel be appointed Lead Counsel for the Class;

B.     Awarding compensatory damages and/or rescission as appropriate against Defendants, in favor of Plaintiff and all members of the Class for damages sustained as a result of Defendants' wrongdoing;

C.     Awarding Plaintiff and members of the Class the costs and disbursements of this suit, including reasonable attorneys', accountants' and experts' fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  August 28, 2024                  Respectfully submitted,


                                         */s/ Joe Kendall*
                                         JOE KENDALL
                                         Texas Bar No. 11260700
                                         **KENDAL LAW GROUP, PLLC**
                                         3811 Turtle Creek, Suite 825
                                         Dallas, TX  75219
                                         Telephone:  214/744-3000
                                         214/744-3015 (fax)
                                         jkendall@kendalllawgroup.com

                                         **ROBBINS GELLER RUDMAN**
                                         **  & DOWD LLP**
                                         SAMUEL H. RUDMAN
                                         MARY K. BLASY
                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)
                                         srudman@rgrdlaw.com
                                         mblasy@rgrdlaw.com

                                         **ROBBINS GELLER RUDMAN**
                                         **  & DOWD LLP**
                                         JUAN CARLOS SANCHEZ
                                         600 West Broadway, Suite 1800
                                         San Diego, CA  92101
                                         Telephone: 619/231-1058
                                         619/231-7423
                                         jsanchez@rgrdlaw.com

                                         *Attorneys for Plaintiff*

Docusign Envelope ID: ECE4852A-F263-4DBC-92D2-8BD0780F5686

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

John A. Thornburg ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ____ 27 day of August, 2024.

Signed by:

*John A. Thornburg*
3FC77DCC59CE491...

John A. Thornburg

AMERICAN AIRLINES

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 07/20/2023 | 4,500 | $17.60 |
| 07/20/2023 | 1,000 | $17.83 |
| 07/20/2023 | 18,900 | $17.84 |
| 07/20/2023 | 100 | $17.83 |
| 07/20/2023 | 9,755 | $18.40 |
| 07/20/2023 | 1,100 | $18.39 |
| 07/20/2023 | 161 | $18.38 |
| 07/20/2023 | 101 | $18.37 |
| 07/20/2023 | 1,025 | $18.36 |
| 07/20/2023 | 4,978 | $18.35 |
| 07/20/2023 | 2,880 | $18.34 |
| 09/13/2023 | 106 | $13.54 |
| 09/13/2023 | 9,894 | $13.54 |
| 12/11/2023 | 45,000 | $13.70 |
| 12/18/2023 | 600 | $14.08 |
| 12/18/2023 | 58,400 | $14.08 |
| 02/01/2024 | 10,000 | $13.92 |
| 02/01/2024 | 10,000 | $13.97 |
| 04/29/2024 | 20,000 | $14.00 |
| 05/16/2024 | 1,496 | $14.75 |
| 05/16/2024 | 8,504 | $14.75 |
| 05/16/2024 | 10,000 | $14.75 |
| 05/16/2024 | 10,000 | $14.70 |
| 05/16/2024 | 10,000 | $14.91 |
| 05/21/2024 | 6,000 | $14.47 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 12/06/2023 | 10,000 | $13.40 |
| 12/08/2023 | 44,500 | $13.74 |
| 12/13/2023 | 45,000 | $14.10 |
| 01/25/2024 | 1,435 | $14.83 |
| 01/25/2024 | 400 | $14.83 |
| 01/25/2024 | 57,165 | $14.82 |
| 02/02/2024 | 20,000 | $14.48 |
| 05/13/2024 | 20,000 | $15.05 |

Prices listed are rounded to two decimal places.